UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



UNITED STATES OF AMERICA,

v.  Criminal No. 2:09cr149

ROBERT LEE WILLIAMS,

Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the court on defendant's motion to suppress evidence discovered during a search of his vehicle and motion to suppress statements that defendant purportedly made to police after his arrest. The defendant, through counsel, argues that the police lacked reasonable suspicion to initiate a traffic stop on the date of his arrest, lacked sufficient justification to search his vehicle after such stop, that defendant's drug use rendered him incapable of knowingly waiving his Miranda rights, and that defendant did not affirmatively waive his Miranda rights before being interrogated by police.

On February 3, 2010, the court held a hearing on defendant's motions and, after hearing the evidence, permitted counsel additional time to submit supplemental briefing. Having received such briefs, based upon the totality of the circumstances, the credibility of the witnesses, and the arguments of counsel, the court finds as follows: (1) the initial vehicle stop was supported by reasonable suspicion; (2) the search of defendant's vehicle was supported by probable cause, or in the alternative, was a valid inventory search; (3) that no evidence was introduced to support defendant's claim that he used drugs on the date of his arrest or that such drug use rendered him incapable of waiving his Miranda rights; and (4) that defendant expressly

acknowledged that he understood his Miranda rights and impliedly waived those rights by responding to police questioning. Accordingly, defendant's motions to suppress are **DENIED**.

## I. Factual Background

On July 13, 2009, around 8:30 p.m., Officer T.L. Williams of the Norfolk Police department was driving in his patrol car when he received a transmission from police dispatch requesting him to respond to basketball courts located near the 2300 block of Ballentine Boulevard in Norfolk, Virginia. Officer T.L. Williams was told via radio that a "a concerned citizen" had provided a tip indicating that defendant Robert Lee Williams was at the basketball courts and that there were warrants out for his arrest. The "concerned citizen," who remained anonymous, indicated that Robert Williams was an African American male and that he was wearing a white T-shirt, khaki pants, and that he drove a black SUV.

Officer T.L. Williams immediately verified that Robert Lee Williams did in fact have outstanding arrest warrants and the officer was able to access a picture of Robert Lee Williams, an African American male, on the computer in his patrol car. As Officer Williams approached the basketball courts, he saw an African American male wearing the same clothes as reported by the anonymous tipster walking toward a black Chevy Tahoe SUV. Officer T.L. Williams compared the picture of Robert Lee Williams with the individual walking toward the Tahoe and confirmed that he had located Robert Lee Williams. Officer T.L. Williams acknowledges that it was just starting to get dark out when he identified the defendant, that he never stopped his police car while looking at the suspect, and that he was approximately 20-25 yards from the suspect. However, Officer T.L. Williams testified that there was nothing obstructing his view, that he was only moving three to four miles-per-hour in his car, and that he was able to confirm a match

between the suspect and the picture.

Officer T.L. Williams did not approach Robert Williams at the basketball courts because: (1) he was alone in his patrol car; (2) there were numerous other individuals in the area; and (3) the report he had received from dispatch suggested that Robert Lee Williams may be armed. Officer Williams therefore radioed for backup and passed by the basketball courts without stopping. Officer Williams made a U-turn and when he passed by the courts for a second time the defendant had already entered his vehicle and started driving away.

Officer T.L. Williams followed the defendant for a short time in his patrol car and activated his car's lights as soon as the defendant turned into a BP gas station. The defendant stopped his Tahoe in the middle of the gas pump area and exited his vehicle. Officer T.L. Williams immediately instructed the defendant to get back into the Tahoe; however, rather than complying, the defendant fled from the gas station on foot. The defendant was later found a couple of blocks away hiding behind a pile of wood. The defendant was placed under arrest and a search of his person revealed a small "user-quantity" amount of marijuana.

Another Norfolk Police officer, Officer M.B. Williams, respond to the area after Officer T.L. Williams radioed for backup. Officer M.B. Williams arrived at the BP gas station within ten seconds of hearing over his radio that the suspect had fled on foot. Officer M.B. Williams testified that when he arrived at the gas station the black Tahoe was stopped between two gas pumps, blocking access to such pumps, and that the driver's side door was left open. Officer M.B. Williams was required by police procedure to do an inventory search of the vehicle before it could be towed. However, upon initial plain view inspection of the vehicle to make sure that there were no other occupants inside, Officer M.B. Williams smelled a strong odor of

3

marijuana coming from the Tahoe. He thereafter searched the vehicle and found a loaded handgun underneath the driver's seat and nearly a pound of marijuana behind the passenger seat. The marijuana was inside a sealed clear freezer bag and then loosely placed inside a larger black trash bag.

After the defendant was in police custody, Norfolk Police Investigator Lisa Heinzen, part of the Vice/Narcotics division, was contacted. When Investigator Heinzen arrived at the BP station, the defendant's Tahoe was still in the middle of the gas pumps, and both Officers T.L. Williams and M.B. Williams were at the scene. Investigator Heinzen spoke with the officers, photographed the Tahoe, and briefly spoke to the defendant who refused to give his name. Investigator Heinzen told Officer T.L. Williams to take the defendant to the police station where his identity could be verified. Investigator Heinzen testified that she did not smell the odor of marijuana on the defendant's person nor smell an odor coming from the Tahoe; however, the large bag of marijuana had already been removed from the Tahoe by the time Investigator Heinzen arrived at the BP gas station.

After being transported to the police station, the defendant was identified as Robert Lee Williams and placed in a holding cell. Officers T.L. and M.B. Williams went to the narcotics division and turned over the confiscated firearm and large bag of marijuana to Investigator Heinzen. At the suppression hearing, Investigator Heinzen described the marijuana packaging the same way as Officer M.B. Williams: nearly a pound of marijuana in a sealed clear freezer bag located inside a large black trash bag. Investigator Heinzen confirmed that when the bags were turned over to her, she could smell a strong odor of marijuana coming from the bags.

The defendant was moved from the holding cell to an interview room and Investigator

Heinzen went in to speak with the defendant. Before starting her interrogation, Investigator Heinzen read the defendant his rights off of a "PD-381" card; the defendant was instructed of his right to remain silent, that his statements could be used against him, his right to a lawyer, and that if he cannot afford a lawyer that one would be appointed. Although defendant did not sign a Miranda waiver form or expressly state that he "waived" his Miranda rights, he did state to Investigator Heinzen, "you've seen my record, I know my rights." The defendant thereafter made a somewhat lengthy statement and, according to Investigator Heinzen, although the defendant was angry and somewhat arrogant, he did "own up" to his conduct in a round about way. Specifically, defendant stated that he knew he was in a lot of trouble. When Investigator Heinzen asked whether he meant for the drugs, the defendant responded that he meant for the gun, which had not yet been discussed during the interrogation. Investigator Heinzen, as well Officers T.L. Williams and M.B. Williams, indicated that the defendant did not appear intoxicated and that he did not have bloodshot eyes or slurred speech.

## II. Analysis

Defendant offers two arguments as to why the evidence discovered during the search of his vehicle should be suppressed and two arguments as to why his statement to police should be suppressed. First chronologically, defendant argues that Officer T.L. Williams unconstitutionally seized the defendant when the traffic stop was initiated without reasonable suspicion. Second, defendant argues that there was no legitimate basis to search his vehicle. As to the defendant's statement to police, defendant first argues that he used marijuana and ecstacy on the day of his arrest and was not capable of making a knowing waiver of his Miranda rights. Defendant's second claim seeking to suppress his statement is that he never made an express waiver of his

Miranda rights. For the reasons stated on the record and set forth below, all four claims fail.

### A. Reasonable Suspicion to Stop Defendant's Vehicle

Police officers may initiate brief investigatory stops if they have "reasonable suspicion to believe that 'criminal activity may be afoot.'" United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). "[T]he reasonable suspicion standard defies precise definition, [but] it is less demanding than probable cause and falls considerably short of satisfying a preponderance of the evidence standard." Id. (citations omitted). Although the test for reasonable suspicion is not onerous, reasonable suspicion "require[s] more than a mere 'hunch' to justify a stop." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004).

An <u>uncorroborated</u> anonymous tip is insufficient to establish reasonable suspicion. See Florida v. J.L., 529 U.S. 266, 270-74 (2000) (anonymous telephone tip indicating that a young black male at a bus stop wearing a plaid shirt was carrying a gun did not constitute reasonable suspicion to frisk the individual meeting such description because the police must corroborate more than just the portion of the tip that "help[s] the police correctly identify the person whom the tipster means to accuse"); United States v. Reaves, 512 F.3d 123, 128 (4th Cir. 2008) (holding that a tipster's contemporaneous description of the suspect's vehicle and its movements was insufficient corroboration to establish reasonable suspicion). In contrast, tips based on a "face-to-face encounter" with a citizen from the neighborhood where illegal activity is purportedly occurring do not "pose th[e] same credibility problem" as with an anonymous telephone tipster who has "not placed his credibility at risk and can lie with impunity." United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) (internal citations omitted).

Anonymous telephone tips can be corroborated through verifying predictive behavior,

that is, a tip can establish reasonable suspicion when the tipster accurately predicts a suspect's future acts–even legal acts such as driving to a specified location–because the verification of such future acts makes the tip reliable "because it demonstrate[s] inside information – a special familiarity with [the suspect's] affairs." Reaves, 512 F.3d 126 (quoting Alabama v. White, 496 U.S. 325, 332 (1990)) (second alteration in original). Anonymous tips can also be corroborated "without the presence of predictive information" when police have objective reasons to believe that the tip has a particular indicia of reliability. Perkins, 363 F.3d at 325.

Here, in determining whether reasonable suspicion existed to initiate the traffic stop, the court considers the totality of the circumstances to determine whether Officer T.L. Williams had an objective basis for singling out the individual he pulled over on July 13, 2009. See Griffin, 589 at 152 (indicating that the officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity."). Based on the testimony in this case, it is apparent that Officer T.L. Williams had a sufficient basis to stop the defendant's vehicle. Officer T.L. Williams was able to identify "the person whom the tipster means to accuse" as the tipster's description of location, clothing, and the suspect's vehicle were all verified. While verifying the tipster's intended target is clearly not enough, here, the police were also able to verify that, as reported by the tipster, Robert Lee Williams did in fact have several warrants out for his arrest. However, most importantly in the reasonable suspicion calculus is the fact that Officer T.L. Williams was able to compare a picture of the "Robert Lee Williams" with warrants out for his arrest with the individual singled out by the tipster and determine from his own observation that it was the same person.[1]

---

[1] This fact alone appears sufficient to establish reasonable suspicion because even without the tip, the officer at that point knew he was looking at an individual who had several warrants

Although the defendant challenges Officer T.L. Williams' ability to make a comparison between the suspect walking toward the black Tahoe and the photograph because, among other things, it was starting to get dark out and Officer Williams was moving in his vehicle, the court found Officer T.L. Williams' testimony credible regarding his ability to positively identify the defendant as Robert Lee Williams.[2] As reasonable suspicion is not an onerous standard, the testimony establishes that the traffic stop was justified after the police visually verified that the suspect singled out by the tipster was in fact Robert Lee Williams, who had warrants out for his arrest. See Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001) ("Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous.").

**B. Constitutionality of the Vehicle Search**

The search of the defendant's vehicle, after he fled the scene on foot, was justified because the police had probable cause to search the vehicle. In the alternative, the search was a valid inventory search.

The court credits Officer M.B. Williams' testimony that he could smell a strong odor of marijuana emanating from the defendant's vehicle when he initially approached the Tahoe, which had its driver's side door open. There is no question that such odor, coupled with defendant's flight from the vehicle, was sufficient to establish probable cause. See United States v. Lynn, – F.3d –, 2010 WL 322176, at *7 n.7 (4th Cir. Jan. 28, 2010) ("The smell of marijuana

---

out for his arrest. Officer T.L. Williams was surely justified in initiating a traffic stop to confirm the suspect's identity and place him under arrest.

[2] Furthermore, considering the totality of the circumstances, reasonable suspicion likely existed even if Officer T.L. Williams was only able to confirm that the suspect closely resembled the photograph of Robert Lee Williams since reasonable suspicion "does not deal with hard certainties, but with probabilities." United States v. McCoy, 513 F.3d 405, 413 (4th Cir. 2008) (quoting United States v. Sokolow, 490 U.S. 1, 8 (1989)).

in the passenger compartment of the car furnished police with probable cause to search that compartment.") (citing United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002)); United States v. Humphries, 372 F.3d 653, 657 (4th Cir. 2004) (recognizing that "'[h]eadlong flight' upon noticing police" is one of the factors that impacts the totality of the circumstances determination of whether probable cause exists). Once probable cause existed, the police were permitted to search the vehicle based on the "automobile exception" to the warrant requirement which applies even if the police have the keys and exercise full control over the vehicle. United States v. Kelly, – F.3d. –, 2010 WL 322200, at *4 (4th Cir. Jan 28, 2010).

In the alternative, even if there was no odor of marijuana emanating from the vehicle, the police would have inevitably discovered the firearm and marijuana in the vehicle as Officer M.B. Williams was required by police procedure to conduct an inventory search of the vehicle. See United States v. Pittman, 411 F.3d 813, 817 (7th Cir. 2005) ("Even if all else fails, the 'inevitable discovery' doctrine provides a solid ground for upholding the search" of the defendant's car because, at the approach of police, the defendant fled on foot and the police "were entitled to have the car towed, and . . . were entitled to conduct an inventory search."); United States v. Engle, – F. Supp. 2d –, 2009 WL 5227885, at *8 (E.D. Va. Dec. 22, 2009) (Doumar, J.) (finding that even if a second officer's interruption of an in progress valid inventory search violated the Fourth Amendment, because the lawful inventory search would have inevitably discovered the evidence found by the second officer, the exclusionary rule did not apply). Regardless of whether defendant Williams was found and arrested, or escaped leaving his abandoned car at the BP station blocking several gas pumps, the Tahoe was lawfully in police custody and the police were entitled to tow the vehicle and perform an inventory search as required by their established

procedures. See United States v. Matthews, – F.3d – , 2009 WL 5173719, at *2 (4th Cir. Dec. 31, 2009) ("Police officers frequently perform inventory searches when they impound vehicles or detain suspects."); United States v. Brown, 787 F.2d 929, 932 (4th Cir. 1986) (finding a vehicle inventory search appropriate over the defendant's challenge to the impounding of his car from a small parking lot because "[t]he question . . . is not whether there was <u>a need</u> for the police to impound [the defendant's] vehicle but, rather, whether the police officer's decision to impound was <u>reasonable under the circumstances</u>") (emphasis added).

Defendant's motion to suppress the evidence discovered during the search of his vehicle is therefore denied.

### C. Knowing Miranda Waiver

Defendant contends that he did not actually waive his Miranda rights, or in the alternative, that his alleged verbal Miranda waiver did not "constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." Edwards v. Arizona, 451 U.S. 477, 482 (1981). To determine whether a defendant knowingly waived his Miranda rights, the court must examine the "totality of the circumstances." Moran v. Burbine, 475 U.S. 412, 421 (1986); United States v. Guay, 108 F.3d 545, 549 (4th Cir. 1997).

Considering first defendant's claim in his brief that he had used marijuana and ecstacy prior to his arrest and could therefore not make a knowing and intelligent waiver of his rights, the defendant introduced no evidence at the hearing to establish that he used such drugs on the date of his arrest. Furthermore, even if drug use is assumed, defendant presented no evidence of <u>the effect</u> such drugs had on his decision-making ability, and the government presented evidence establishing that defendant did not appear intoxicated, did not have glassy eyes, and did not slur

10

his speech. See United States v. Cristobal, 293 F.3d 134, 142 (4th Cir. 2002) (recognizing that although painkillers and other narcotics could render a defendant incapable of waiving his Miranda rights, the evidence in the case failed to establish that the medications taken by the defendant had the effect of rendering him incapable of knowingly waiving his rights, and that "uncontroverted medical testimony" proved otherwise as the defendant was "alert and coherent at the time of the interview"). Defendant's claim that his waiver was unknowing based on his alleged, but unproven, drug use is unsupported in both fact and law.

Considering next whether defendant actually waived his Miranda rights, defendant argues that his statement to police should be suppressed because Investigator Heinzen admitted that defendant did not sign a Miranda waiver and that he never expressly stated that he "waived" his Miranda rights. Notwithstanding the lack of such express waiver, defendant both indicated to police that he understood his rights and answered the investigator's statements. It is well established that a Miranda waiver need not be express. United States v. Frankson, 83 F.3d 79, 82-83 (4th Cir. 1996).

In Frankson, the Fourth Circuit rejected the defendant's claim that his statement should be suppressed because "he never formally waived his constitutional rights." Id. at 82. In ruling that a valid waiver occurred, the court explained that a defendant need not utter specific words to waive his rights, but that a defendant's willingness to answer questions after acknowledging that he understands his rights constitutes an implied waiver. Id. In United States v. Cardwell, 433 F.3d 378 (4th Cir. 2005),the Fourth Circuit, citing both Frankson and Supreme Court precedent, reiterated such standard, explaining:

> [A Miranda] [w]aiver need not be express, but may be implied from the
> defendant's actions and words. . . . Hinson argues that he did not voluntarily

11

waive his Miranda rights. We are not persuaded. The Agents informed Hinson of his Miranda rights, and Hinson indicated that he understood them. He did not, however, invoke those rights at any time. While law enforcement officers must immediately stop custodial interrogation when the defendant asserts his Miranda rights, they are free to engage in custodial interrogation when they have given Miranda warnings and the defendant does not specifically invoke those rights. Hinson's failure to invoke his rights therefore left Agent High free to interrogate him. If Hinson had wished to exercise his right to remain silent in response to Agent High's question, nothing prevented him from doing so. Because Hinson had been fully informed and indicated his understanding of his Miranda rights, his willingness to answer Agent High's question is as clear an indicia of his implied waiver of his right to remain silent as we can imagine.

Id. at 389-90 (internal citations omitted).

Here, as in Frankson and Cardwell, the evidence establishes that defendant was read his Miranda rights and that he expressly stated to the police examiner that he understood such rights. Although defendant Williams was never asked if he waived his Miranda rights, he answered questions and did not invoke his right to remain silent. "Because [Williams] had been fully informed and indicated his under-standing of his Miranda rights, his willingness to answer [Investigator Heinzen's] question[s] is as clear an indicia of his implied waiver of his right to remain silent as [the court] can imagine." Id. Accordingly, defendant's motion to suppress his statement to police is denied.

### III. Conclusion

For the reasons set forth above and at the hearing, the court **DENIES** defendant's motion to suppress evidence seized during the search of his vehicle and motion to suppress his statement to police.

The Clerk is **REQUESTED** to send a copy of this Order to the defendant's counsel and the United States Attorney.

It is so **ORDERED**.

/s/ *signature*
Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

Norfolk, Va.
February 8, 2010